IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| BRENNA LEE-ANN SCOTT,<br><br>    Plaintiff,<br><br>vs.<br><br>ANDREW SAUL,<br>Commissioner of Social Security,<br><br>    Defendant. | No. 19-CV-4037-LRR-KEM<br><br>**REPORT AND RECOMMENDATION** |

    Plaintiff Brenna Lee-Ann Scott seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her application for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. Scott argues that the administrative law judge (ALJ) erred in formulating her residual functional capacity (RFC), including by failing to obtain opinion evidence from her treating providers or a consultative examiner and by failing to include limitations related to her cognitive functioning. I recommend **reversing** the Commissioner's decision and remanding to the Social Security Administration for further proceedings.

## I.    BACKGROUND

    Upon graduating from high school in 2010 (with assistance from a one-on-one aide), Scott completed training to be a security guard through Job Corps in 2012. AR

237, 666.[1]  From 2012 through early 2016, she held a variety of positions, including as a security guard and working at a call center.  AR 43-44, 237, 267-69.

In 2012, Scott began experiencing episodes of headaches, numbness, and dizziness, and in October 2013, after a brain MRI,[2] she was diagnosed with Chiari malformation type I.

> Chiari malformation is a condition in which brain tissue extends into [the] spinal canal.  It occurs when part of [the] skull is abnormally small or misshapen, pressing on [the] brain and forcing it downward. . . .  Chiari malformation type I develops as the skull and brain are growing.  As a result, signs and symptoms may not occur until late childhood or adulthood.[3]

A person may not suffer any symptoms as a result of Chiari malformation.  AR 1472.  The most common symptom is severe headaches in the back of the head, which may spread to the neck and shoulders and worsen with coughing, sneezing, or straining.  AR 530, 1472.  If a larger amount of brain tissue extends into the spinal canal, a person with Chiari malformation may also suffer dizziness, trouble with balance, muscle weakness, a tingling or burning sensation in the fingers or toes, vision issues, or trouble sleeping.  *Id*.  Symptoms may come and go.  AR 1472.

Near the end of March 2016, Scott began complaining of increased pressure in her head and on-again, off-again numbness in her arms and legs.  AR 498-99, 503-04.  She noted that within the past month, she had begun new employment as a lab technician at Wells Blue Bunny, which required her to flex her neck often, and she wondered if the new job exacerbated her Chiari malformation.  AR 44, 497, 504.  Shortly thereafter, she

---

[1] "AR" refers to the administrative record below, filed at Docs. 9-2 to 9-17.

[2] Magnetic resonance imaging.

[3] ***Webb v. Berryhill***, 294 F. Supp. 3d 824, 834 n.7 (D.S.D. 2018) (quoting http://www.mayoclinic.org/diseases-conditions/chiarimalformation/home/ovc-20249651, accessed February 16, 2018); *see also* AR 530, 1471.

obtained new employment working in a group home for people with mental disabilities. AR 43, 237, 267-69. In May 2016, she had a neurology consult with neurosurgeon Grant Shumaker, MD, who confirmed Scott's "mild Chiari malformation," and also noted "basilar invagination" (AR 353), which causes similar symptoms as Chiari malformation and occurs when the second vertebrae in the neck moves upward and places pressure on the brain stem.[4] Dr. Shumaker operated on Scott on June 17, 2016, removing bone from her skull and cervical spine to relieve pressure on the brain (decompression) and fusing the upper vertebrae in her neck together. AR 358, 653, 1106. Scott remained in the hospital for four days after her surgery and was discharged on June 21, 2016, with instructions to wear a rigid neck brace preventing her from moving her neck. AR 384.

On July 3, 2016, while Scott was still wearing her neck brace (*see* AR 364, 522-23), she went to the emergency room (ER) complaining of right arm pain, weakness, numbness, and balance issues when walking. AR 361. She noted that initially, surgery improved her unsteadiness, but that she had returned to her baseline pre-surgery difficulties with balance and walking. *Id*. Because of her recent surgery and providers' observations that she was "somewhat unsteady with walking," she was admitted to the hospital overnight for observation. AR 361-62, 372-79. The next morning, she reported feeling steady on her feet, and she was discharged after CT[5] and MRI scans revealed no postoperative complications. AR 362, 372, 377-79.

Scott returned to Dr. Shumaker the next day, July 5, 2016. AR 363-64. She reported that her baseline pre-surgery arm symptoms had returned. AR 363. Dr. Shumaker noted that her CT and MRI scans did not show anything unexpected and

---

[4] *See **Basilar Invagination***, Cedars Sinai https://www.cedars-sinai.edu/Patients/Health-Conditions/Basilar-Invagination.aspx (last visited April 22, 2020).

[5] Computed tomography.

3

referred Scott to physical therapy, noting that Scott might be weaned off the neck brace. AR 364.

Scott had not worked since her surgery—and since she had been at her job for less than ninety days, the group home was unwilling to hold the position open for her while she was hospitalized and recovering from surgery. AR 43. Scott filed applications for DI and SSI benefits on July 5, 2016, the day Scott met with Dr. Shumaker post-discharge. AR 10. She alleged disability since June 14, 2016, based on Chiari malformation, deafness in one ear, and "heart problems." AR 72-73.

The Social Security Administration denied Scott's disability applications on initial review on October 20, 2016. AR 72-89. In connection with that review, state agency medical and psychological consultants determined that Scott suffered from no severe impairments that affected her ability to function (the state agency medical consultant opined that Scott's symptoms caused by Chiari malformation would improve within twelve months as a result of surgery). AR 76-78. In the time between filing for disability and the denial of her application, Scott had had three appointments possibly related to her Chiari malformation: she visited her primary care provider complaining of muscle spasms since surgery and complaining of depression due to the fact that she would have lifelong mobility issues with her neck (her primary care provider prescribed a muscle relaxer and an antidepressant) (AR 532-35); she visited her primary care provider complaining of "black[ing] out for a second" and suffering a fall (AR 653-55); and she had a follow-up appointment with Dr. Shumaker in which he noted she was progressing well in physical therapy (AR 636-37) (Scott also sought treatment for chest pain and a rapid heart rate during this time (another possible cause of the fall) and was eventually prescribed a beta blocker (AR 713-14, 731-40)). In addition, prior to the initial denial of her disability applications, Scott went to a one-time consultative examination ordered by the Social Security Administration, after which psychologist Anthony Larson, PsyD,

4

gave an opinion on Scott's mental residual functional capacity (RFC).[6] AR 665-68. Dr. Larson noted "areas of concerns" included Scott's concentration and memory, attention and calculation, and anxiety. AR 667. Dr. Larson concluded, however, that Scott "should be able to understand and carry out instructions, interact appropriately with others, exercise proper judgment, and remain flexible in the workplace." *Id.*

Scott moved for reconsideration of her claims for DI and SSI benefits. In the interim, on October 11, 2016, she visited Dr. Shumaker for a follow-up appointment, in which she reported "doing well" other than suffering intermittent headaches over the last two weeks. AR 685-86. Dr. Shumaker prescribed tramadol. *Id.* On October 18, 2016, Scott had an appointment with her primary care provider in which she requested a referral to a neurologist to treat her headaches. AR 743-47. Scott said that surgery helped her headaches initially, but then they returned worse than before. *Id.* Scott also reported intermittent blurry vision and right arm tingling. *Id.* Scott's primary care provider provided the neurology referral and also prescribed a medication to help her sleep. *Id.* On January 6, 2017, Scott had another appointment with her primary care provider in which she requested that her primary care provider take over prescribing the medications currently prescribed by Dr. Shumaker. AR 764-66. Scott noted that she had been taking tramadol for headaches and neck pain once or twice a day and that it helped with the pain. *Id.*

The Social Security Administration denied Scott's DI and SSI applications on reconsideration on January 12, 2017. AR 92-113. In connection with that review, two different state agency consultants reviewed the treatment records and other evidence and agreed with the initial determination that Scott suffered from no severe impairments. AR 97-99.

---

[6] RFC means "the most that a claimant can do despite her limitations." **Sloan v. Saul**, 933 F.3d 946, 949 (8th Cir. 2019) (citing **20 C.F.R. § 416.945(a)(1)**).

Scott moved for reconsideration by an ALJ and continued to seek treatment for symptoms consistent with Chiari malformation. On January 23, 2017, Scott complained to her primary care provider that her headaches were gradually worsening. AR 767-68. She admitted that her medication (tramadol and amitriptyline at bedtime) helped. *Id.* She noted that she was trying to come up with the funds out of pocket to consult with a Chiari malformation specialist on the east coast. *Id.* Her primary care provider took no action, deciding to wait and see what the neurologist did at Scott's upcoming consultation. *Id.* A few days later, Scott had her neurology appointment, where she complained of constant headaches at the back of the head, as well as neck pain, dizziness, and numbness down her arms. AR 769-71. The neurologist ordered brain and neck MRIs and prescribed gabapentin instead of amitriptyline (at some point, Scott discontinued gabapentin and returned to taking amitriptyline, reporting that gabapentin made her feel "like a zombie" and caused memory issues). AR 769-71, 1108. A little over a month later, Scott returned to her primary care provider, reporting that she had been sleeping for only a few hours a night. AR 774-77. Her primary care provider increased the dosage of her sleeping medication. *Id.* Scott noted that her headaches had not improved and that she was still trying to save money to see the Chiari malformation specialist on the east coast. *Id.* Her primary care provider indicated he did not want to refill Scott's tramadol because he did not want to interfere with the neurologist's evaluation of Scott's headaches, but then stated he "may try to contact" the neurologist to see if it was okay if Scott took tramadol. AR 777.

Three months later, in June 2017, Scott went to the ER complaining of neck pain, balance issues, and memory loss after hitting her head a few days previously, explaining that she had been helping her mother move when a table leaf hit her right at her fusion spot. AR 943, 947. She also reported experiencing memory loss since the accident. AR 944. She was discharged after a CT of her head and neck came back negative. AR 946. Two months after that, in August 2017, Scott met with her primary care provider,

6

reporting worsening symptoms related to her Chiari malformation. AR 782-88. Her doctor noted she was "somewhat vague about this," complaining generally of headaches, neck discomfort, decreased neck range of motion, and intermittent numbness of her right extremities. *Id.* In the review of systems, however, her primary care provider noted she denied fatigue, blurred vision, weakness, and "headache." *Id.* Scott again mentioned trying to see the Chiari malformation specialist on the east coast. *Id.* She also stated that amitriptyline helped her symptoms and helped her sleep, and her primary care provider increased her dosage at her request. *Id.* Her primary care provider recommended she obtain a second opinion from another neurosurgeon. *Id.*

The next month, in September 2017, Scott met with a neurosurgeon in Iowa City (about a four-and-a-half-hour drive from where Scott lived), complaining of headaches and balance issues. AR 1346-49. The neurosurgeon agreed with Dr. Shumaker that there were no surgical interventions to help Scott's symptoms. *Id.* Two months later, in November 2017, Scott returned to her primary care provider, complaining of increased achiness in her neck, as well as upper back pain. AR 789-93. Her primary care provider noted that he did not want to start Scott on chronic opioid therapy and referred her to the pain clinic to see if other treatments would help. *Id.* Scott next visited her primary care provider in February 2018 for an unrelated issue, and she reported no concerns. AR 795. A few weeks later, at a medication-management appointment, Scott told her primary care provider that she continued to have neck and back discomfort. AR 1368-71. Later in March 2018, Scott had her first appointment at the pain clinic, reporting pain radiating from the back of her head to the base of her neck. AR 1106-09. She stated that her pain started in 2012 and worsened after surgery in 2016. *Id.* She noted that she had not been able to drive since her surgery due to decreased range of motion in her neck. *Id.* She also mentioned suffering headaches, muscle spasms, and numbness and tingling in her left arm. *Id.* She said that she had researched specialists in Chiari malformation and wanted to see one, but the closest two were located in Chicago and Colorado, and neither

accepted her health insurance. *Id.* She reported taking amitriptyline and over-the-counter medications, as well as tramadol in the past—which she said "worked great," but she did not want to take stronger pain medications. *Id.* Ultimately, the pain clinic provider restarted Scott on tramadol. *Id.*

Scott returned to the pain clinic a month later. AR 1386-89. She complained of pain in her neck and shoulders and requested an increased dosage of tramadol. *Id.* Instead, the pain clinic provider continued her tramadol at the current dosage and prescribed a muscle relaxer for muscle spasms. *Id.* The next week, Scott denied suffering headaches to her primary care provider while seeking treatment for drainage issues with her left ear. AR 1375.

At the end of May 2018, Scott went to the ER, complaining of head and neck pressure (but not pain) and blurry vision. AR 1458-66. After a normal CT, she was discharged with instructions to follow up with her primary care provider. *Id.* At an appointment with her primary care provider the next week, Scott primarily complained of anxiety and depression, and her doctor prescribed Lexapro. AR 1378-81. She denied any change in her chronic headaches and reported some fatigue and poor sleep. *Id.* Later in June 2018, at the pain clinic, she reported neck and upper back pain, as well as spasms and numbness in her arms and legs. AR 1383-86. Her medications were continued (although Scott reported she did not need a tramadol refill at that time). *Id.*

On August 2, 2018, Scott presented to the ER, complaining of muscle tension and spasms, confusion, and ataxia (impaired balance or coordination) for the past four days. AR 1489-96. She denied headaches and dizziness and rated her pain at zero out of ten. *Id.* She noted that a specialist in Chiari malformation would be starting in Sioux Falls, South Dakota, soon (a little over an hour away from where Scott lived), who she hoped to see regarding her symptoms. *Id.* Scott asked to be admitted to the hospital, noting she was nervous about being home alone while her boyfriend worked overnight. *Id.* After a CT scan revealed no abnormalities, she was discharged. *Id.* The ER provider

8

noted that Scott "definitely [had] some muscle tension and anxiety going on" and suggested that she spend the night at her mother's house to help ease her anxiety. *Id.*

On August 16, 2018, the ALJ held a video hearing, at which Scott and a vocational expert testified. AR 10, 37-38. On November 23, 2018, the ALJ issued a written decision following the familiar five-step process outlined in the regulations[7] to determine Scott was not disabled from June 2016 through the date of the decision. AR 10-25. Unlike the state agency medical consultants, the ALJ determined that Scott suffered from severe impairments—"chiari I malformation with basilar invagination, status post suboccipital decompression, occipital to C3 instrumentation, and lateral mass fusion, occipital to C3-4; and loss of hearing, left side." AR 13. The ALJ considered Scott's headaches as a separate impairment but found them to be nonsevere. AR 13-14. The ALJ also found that Scott's anxiety and depression caused no more than minimal limitation in Scott's ability to perform basic work activities. AR 14. Despite her impairments, the ALJ found that Scott retained the following RFC:

> [Scott] has the [RFC] to perform light work . . . but with additional limitations. She can perform frequent, rather than constant, bilateral reaching overhead and reaching in other directions. She can perform frequent pushing and pulling bilaterally. She can occasional[ly] operate foot controls bilaterally. She can occasionally climb ramps and stairs, and she can never climb ladders, ropes, or scaffolds. She can frequently balance and occasionally stoop, kneel, crouch, and crawl. She can perform no work around hazards such as unprotected heights and moving mechanical parts. She can perform no operation of a motor vehicle as part of the job

---

[7] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* **20 C.F.R. §§ 404.1520(a)(4); 416.920**. The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004)).

9

duties. She is limited to working in an environment with no more than a moderate noise level . . . .

AR 16. The ALJ found that Scott had no past relevant work, but that other jobs existed in significant numbers Scott could perform, including shipping and receiving weigher, marker, and routing clerk. AR 24. Thus, the ALJ determined that Scott was not disabled. AR 25.

Scott appealed. The Appeals Council denied Scott's request for review on May 20, 2019 (AR 1-3), making the ALJ's decision the final decision of the Commissioner. *See* **20 C.F.R. §§ 404.981, 416.1481**. Scott filed a timely complaint in this court seeking judicial review of the Commissioner's decision (Docs. 1, 4). *See* **20 C.F.R. § 422.210(c)**. The parties briefed the issues (Docs. 16-17), and the Honorable Linda R. Reade, United States District Judge for the Northern District of Iowa, referred this case to me for a Report and Recommendation.

## II. DISCUSSION

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole." **Kirby v. Astrue**, 500 F.3d 705, 707 (8th Cir. 2007); *see also* **42 U.S.C. § 405(g)**. "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." **Kirby**, 500 F.3d at 707. The court "do[es] not reweigh the evidence or review the factual record de novo." **Naber v. Shalala**, 22 F.3d 186, 188 (8th Cir. 1994). If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision." **Robinson v. Sullivan**, 956 F.2d 836, 838 (8th Cir. 1992).

Scott makes three interrelated and overlapping arguments: she argues that the ALJ's RFC determination is not supported by some medical evidence, that the ALJ should have explained how the medical opinions in the record support the ALJ's RFC

10

determination, and that the ALJ should have obtained a medical opinion from a treating source or consultative examiner regarding the limitations imposed by Scott's Chiari malformation. Scott also generally argues that the ALJ's RFC determination is not supported by substantial evidence and that the ALJ should have included additional limitations in Scott's RFC.

### A. *Some Medical Evidence*

When determining a claimant's RFC, the ALJ must consider "all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000). The ALJ's RFC determination must be supported by at least some medical evidence that "addresses the claimant's ability to function in the workplace." *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001) (quoting *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001)). An ALJ may not "play doctor" and "substitute his opinions for those of the physician[s]." *Combs v. Berryhill*, 878 F.3d 642, 647 (8th Cir. 2017) (quoting *Pate–Fires v. Astrue*, 564 F.3d 935, 946-47 (8th Cir. 2009); *Finch v. Astrue*, 547 F.3d 933, 938 (8th Cir. 2008)).

Scott argues that no medical evidence supports the ALJ's RFC determination and that the ALJ should have obtained a medical opinion addressing the effects of Scott's Chiari malformation on her ability to function physically. I agree. Here, no medical opinion in the record addresses the effects of Scott's Chiari malformation—Scott's treating providers did not submit medical opinions, the Social Security Administration did not order a consultative examination to evaluate Scott's physical limitations, and the state agency medical consultants determined Scott's Chiari malformation was not a serious impairment and caused no functional limitations (in contrast to the ALJ). *See* 76-77, 97-98. The state agency medical consultants opined that the effects of Scott's Chiari malformation would improve with surgery and would not last twelve months—in contrast

11

to the ALJ's findings and to the treatment notes in the record. The ALJ could not have relied on the state agency medical consultants' "assessment of the limitations caused by [the claimant's Chiari malformation] when [the consultants] did not even agree with the ALJ as to the existence *vel non* of th[at] impairment[]." *Lauer*, 245 F.3d at 705. I recommend finding that "some medical evidence" does not support the ALJ's physical RFC determination.[8]

Relatedly, Scott argues that the ALJ should have obtained a medical opinion from a treating or examining source. In *Nevland v. Apfel*, 204 F.3d 853, 857-58 (8th Cir. 2000), the Eighth Circuit held that "the ALJ should have sought . . . an opinion from [claimant's] treating physicians or, in the alternative, ordered consultative examinations," rather than "rel[y] on the opinions of non-treating, non-examining physicians . . . to form an opinion of [claimant's] RFC" when numerous treatment notes "establishe[d] that [claimant] suffer[ed] from . . . impairments which prevent him from performing his past relevant work" but not how those impairments "affect his [RFC] to do other work." Thus, *Nevland* does not require the ALJ obtain opinion evidence from an examining source when "other medical evidence in the record"—such as treatment notes and the state agency consultants' opinions—"clearly establishes a claimant's RFC to do other work[] and to function in the workplace." **Kruger v. Colvin**, No. C13-3036-MWB, 2014 WL 1584411, at *10 (N.D. Iowa Apr. 21, 2014), *report and recommendation adopted by* 2014 WL 2884038 (N.D. Iowa June 25, 2014); *see also* **Becherer v. Colvin**, No. 4:12CV2356 ACL, 2014 WL 4230906, at *13 (E.D. Mo. Aug. 26, 2014) (noting that the claimant in *Nevland* "provided medical evidence that documented his limited functional capabilities" and holding that remand is not required when "no medical

---

[8] To the extent Scott argues no medical evidence supports the ALJ's mental RFC determination, I disagree. The ALJ's RFC determination with respect to Scott's mental limitations caused by her Chiari malformation is supported by the consultative examiner's opinion (AR 665-68) and the treatment records (as will be discussed further in the next section).

12

evidence in the record support[s] any greater limitations than those found by the ALJ"); *Symens v. Colvin*, No. CIV 13-3006-RAL, 2014 WL 843260, at *26 (D.S.D. Mar. 4, 2014) (holding that remand is not required under *Nevland* when "the ALJ engaged in an extensive review of the medical evidence. . . . [that] supported the ALJ's" RFC and "was also consistent with the reports from the" nonexamining state agency consultants); *Knight v. Astrue*, No. 12-06004-CV-SJ-NKL-SSA, 2012 WL 4092356, at *7 (W.D. Mo. Sept. 17, 2012) ("*Nevland* stands for the proposition that, where the claimant's alleged RFC is otherwise supported by substantial evidence in the record, the ALJ may not rely solely on the opinions of non-examining sources in rejecting the alleged RFC."). "The ultimate question . . . is whether a critical issue was underdeveloped . . . such that the ALJ's decision was not supported by substantial evidence." *Kruger*, 2014 WL 2884038, at *2; *see also* **20 C.F.R. §§ 404.1519a(b), 416.919a(b)** (Social Security Administration may purchase a consultative examination "to try to resolve an inconsistency in the evidence" or "when the evidence as a whole is insufficient" to resolve the claim).

For example, in *Morris v. Colvin*, No. C14-4068-LTS, 2016 WL 3360506, at *10 (N.D. Iowa June 16, 2016), an examining-source opinion was required when "mental health treatment notes" from multiple years "reflect[ed] serious, 'uncontrolled' impairments with severe symptoms and in-patient psychiatric hospitalization," but provided no information of how the claimant's impairments "affect[ed] his ability to function in the workplace." Similarly, the court remanded in *Walker v. Colvin*, No. C 13-3021-MWB, 2014 WL 2884028, at *2 (N.D. Iowa June 25, 2014), *adopting report and recommendation*, 2014 WL 1348016 (N.D. Iowa Apr. 3, 2014), to supplement the record with an examining-source opinion when the treatment notes consisted of "terse summaries of individual treatment sessions that offer no guidance as to how [claimant's] migraines affect her life and everyday functioning." In that case, "the evidence d[id] suggest there may be some work-related limitations associated with [claimant's] migraines," as they occasionally lasted more than a day and required hospitalization, and

13

the state agency consultants found the claimant's migraines impacted her activities of daily living. *Walker*, 2014 WL 1348016, at *10. On the other hand, in *Agan v. Astrue*, 922 F. Supp. 2d 730, 755-56 (N.D. Iowa 2013), the court held *Nevland* did not require remand when treatment notes reflected that the claimant recovered well from surgery and that medication controlled his back pain, and a treatment note from after his surgery reflected a lifting limitation, but no other restrictions. Neither was an examining-source opinion required in *Lewis Smith v. Colvin*, No. C14-4076-LTS, 2016 WL 1248874, at *11 (N.D. Iowa Mar. 29, 2016), because the claimant's "physical impairments were not complex." In that case, after the claimant had surgery for her carpal tunnel syndrome, she "subsequently sought little treatment," "had no serious problems . . . with her hands or fingers," and had normal physical examinations, although she did occasionally report hand pain. *Id.* Her other severe physical impairment was "right knee replacement," but treatment notes reflected normal objective tests and no reports of significant knee problems. *Id.*

The record here is more akin to *Morris* and *Walker* than *Agan* and *Lewis Smith*. Scott has continued to seek treatment for symptoms related to her Chiari malformation, a complex impairment. The treatment records support that Scott's range of motion in her neck is limited. The ALJ disagreed, noting that he observed Scott "turn her neck a number of times at the hearing." AR 21. But the ALJ is not a doctor, and his observations regarding Scott's ability to turn her neck does not mean that Scott's limited range of motion in her neck would not affect her ability to work. The ALJ also pointed to several treatment records in which providers "documented no . . . limitation or abnormalities with respect to her neck movement," but the treatment records the ALJ relied upon reflect objective examinations in which Scott's neck range of motion was not evaluated (not a normal examination). AR 20-21, 786-87, 1370-71, 1385. And one of those treatment records reflects that Scott's primary care provider believed Scott did have decreased range of motion in her neck, as Scott reported, because he referred Scott to a

14

neurosurgeon for a second opinion as a result. AR 788. The ALJ also pointed to examinations by Dr. Shumaker (in July, August, and October 2016) in which Dr. Shumaker noted: "Musculoskeletal: . . . JBMT: No tenderness to palpation, full [range of motion], no instability; normal strength and tone of head/neck, spine, bilateral arms, and bilateral legs." AR 18, 364, 637, 686. It is unclear what "JBMT" stands for, but for at least one of those appointments with Dr. Schumaker (in early July 2016), Scott was still wearing her post-surgery neck brace to prevent neck movement (AR 364; *see also* AR 262, 522)—so these treatment records do not support that Dr. Shumaker observed no limitations in Scott's neck range of motion. As the ALJ noted, both Scott's primary care provider and pain clinic provider observed limited range of motion in Scott's neck in November 2017 and March 2018. AR 20-21, 792, 1109. The ALJ failed to recognize that these appear to be the only times providers evaluated Scott's neck range of motion. I further note that Scott has remained unable to drive a car (which she was able to do prior to surgery) due to the movement limitations in her neck. *See, e.g*, AR 666.

Substantial evidence, including "some medical evidence," does not support the ALJ's physical RFC determination.[9] I recommend remanding to the Social Security

---

[9] Scott also argues that the issuance of handicap parking permits, which require a certification that the claimant "is unable to walk 200 feet without stopping . . . or assistance" or is otherwise "severely . . . limited in ambulation," constitute medical evidence in conflict with the ALJ's RFC determination. Doc. 16 at 10-11. When Scott requested a renewal of her handicap permit in October 2016, her primary care provider referred her to physical therapy for an evaluation of whether the permit was needed; and when Scott declined to go to physical therapy due to the cost, her primary care provider noted "she probably would not qualify" for the permit "based on information given." AR 743. In September 2017, the Iowa City neurosurgeon Scott consulted with once provided Scott with a handicap placard upon Scott's request, noting it was "justified" based on Scott's concerns of "balance issues." AR 1346. I would not find error based on the ALJ's failure to discuss the University of Iowa provider's issuance of a handicap parking sticker, but this evidence lends further support for the need for an examining-source opinion on the limitations caused by Scott's Chiari malformation, and it would be prudent of the ALJ to recognize and discuss this evidence on remand.

Administration with directions to obtain a medical opinion from a treating or consultative source evaluating Scott's Chiari malformation on her ability to function.

### B. *Additional Limitations in RFC*

Scott argues that substantial evidence does not support the ALJ's RFC determination. In particular, Scott argues that "her depression, anxiety, impaired concentration, decreased understanding, memory[,] and ability to apply information[,] as well as her mental and neurological symptoms from her Chiari malformation[,] result in mental limitations of the basic ability to perform the mental demands of simple and unskilled work." Doc. 16 at 7. Scott also argues the ALJ erred by failing to include limitations related to the non-exertional limitations caused by her Chiari malformation—"her frequent headaches, numbness, pain, decreased sensation, light-headedness, fatigue, heat and cold intolerance, blurred vision, joint pain, difficulty swallowing[,] and neurological deficits." *Id*.

The ALJ pointed to evidence that almost all of Scott's neurological examinations were normal—including evaluations of strength and sensation in her extremities. AR 21-22, 364, 372, 374, 534, 637, 654, 686, 714, 735, 740, 771, 776, 786-87, 792, 947, 1108, 1463; *but see* AR 362, 374, 746, 1346. As outlined in the background section, although Scott sometimes complained of weakness or numbness, she only reported suffering a fall once, in September 2016 (which may have been caused by blood pressure issues and for which she was prescribed medication). AR 653, 735. And the frequency with which she reported suffering from headaches decreased significantly once she began taking tramadol to treat them. Nevertheless, I have already found that the ALJ's RFC determination with respect to Scott's limitations related to her Chiari malformation is not supported by substantial evidence based on the lack of medical evidence.

To the extent Scott argues substantial evidence does not support the ALJ's determination that she can perform the mental demands of simple and unskilled work, I

disagree. A consultative examiner's opinion supports the ALJ's mental RFC determination. *See* AR 665-68. As the ALJ noted, Scott's mental status examinations were almost always normal. *See* AR 14, 364, 637, 686, 714, 787, 1108, 1369, 1385, 1389; *see also* AR 534. The treatment records reflect Scott rarely complained of memory issues, trouble concentrating, anxiety, or depression. *But see* AR 532, 782-88, 943, 1378, 1496. During the review of systems, Scott denied symptoms of anxiety and depression more often than she reported them. *Compare* AR 637, 713, 1349 *with* AR 685, 1108, 1370, 1385, 1388. I recommend finding that the ALJ did not err in evaluating and addressing Scott's cognitive limitations.

### III. CONCLUSION

I recommend that the district court **reverse** the decision of the Social Security Administration, enter judgment in favor of Scott, and remand for further proceedings.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. **Fed. R. Civ. P. 72**. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein. *See United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**ENTERED** this 24th day of April, 2020.

*Kelly K.E. Mahoney*
Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa